Argued December 3, 1959, affirmed February 17, petition for
rehearing denied April 5, 1960

# ROBERTSON *v.* RIGGLE
349 P. 2d 482

W. C. *Winslow,* Salem, argued the cause and filed a brief for appellant.

*J. Ray Rhoten,* Salem, argued the cause for respondent. On the brief were Rhoten, Rhoten & Speerstra, Salem.

Before McALLISTER, Chief Justice, and ROSSMAN, O'CONNELL and REDDING, Justices.

O'CONNELL, J.

This is a suit in equity for the reformation of a contract. The plaintiff was one of the sellers named in the contract; the defendant was the purchaser. Under the terms of the contract, which was consummated on February 17, 1955, the sellers agreed to sell and the purchaser agreed to purchase the interests of the sellers in a partnership which was engaged in the operation of the Jefferson Fur Farm, the principal business of which was the raising of mink. As a part of the bargain the defendant agreed to save harmless the sellers from certain claims and demands. The parties are in dispute as to the scope of this agreement. The contract contained the following provision:

> "3. Buyer hereby assumes and agrees to discharge in the usual course of business all the liabilities of the partnership known as Jefferson Fur Farm and covenants to hold Sellers and each of them harmless from the claims or demands of any person on account of said liabilities including all claims for income or other taxes and all personal injury or property damage claims. There

shall be no pro ration of real property taxes, rentals, if any, or prepaid fire or other insurance premiums and nothing shall be due from Sellers to Buyer on account thereof."

In accordance with the plaintiff's prayer for relief, the lower court reformed the contract by adding the following provision:

"The Buyer agrees to repay to the Sellers severally any additional federal income taxes occasioned by the claims made for periods preceding February 17, 1955, that increases in value of breeding mink were to be considered as capital gains as distinct from ordinary gains."

The defendant asserts that the lower court committed error in reforming the contract and in enforcing the contract as reformed.

Prior to the sale to defendant the Jefferson Fur Farm was owned by plaintiff, his brother, J. V. Robertson, Dr. Fred Ellis and the defendant, each partner owning a one-quarter interest. Dr. Ellis died November 20, 1954 and Charles A. Evans was named administrator of his estate. The contract was entered into between plaintiff, J. V. Robertson, and Evans representing the Ellis estate, as sellers and defendant as the buyer. Defendant agreed to pay $35,000 for each of the interests of the sellers, constituting a total sale price of $105,000.

The principal question is whether in addition to the recited consideration the defendant had agreed to save the sellers harmless from liability arising out of claims for income taxes made by the federal government against the sellers for periods preceding the date of the contract. The plaintiff contends that the exculpatory clause of the contract was inserted because there was the possibility that the sellers would

be assessed a tax in addition to that paid in filing their personal federal income tax returns. This contingent liability and the plaintiff's understanding of the agreement with respect to it are stated in the following excerpt from his complaint:

"* * * in making the federal income tax returns of the partners of said partnership plaintiff and the other partners filed their respective income tax returns on the basis of inclusion in the partnership income of credit for capital gains on breeding fur animals. At the time of and on the occasion of the execution of said February 17, 1955 agreement the defendant, this plaintiff and the other partners understood that, while such capital gains credits were being claimed, such credits might not be allowed by the Treasury Department of the United States and particularly the Internal Revenue Service thereof and it was the intention of the plaintiff and the defendant, as well as the other partners in the partnership, that by the terms of said paragraph 3 of said February 17, 1955 agreement the defendant would save the plaintiff and the other partners harmless from any income tax liability arising by reason of any rejection by the Treasury Department of the United States of the claims of this plaintiff and the claims of the other partners for such capital gains credits."

The complaint then recites that the federal tax authorities had rejected the plaintiff's claims for the capital gain credits on the sale of the mink pelts and that he had paid the additional tax.

It is apparent from the foregoing recitation of the facts that, although plaintiff denominates his suit as one for reformation, it is more properly a suit calling for the interpretation of the ambiguous language contained in the contract wherein defendant covenants to save the sellers harmless for "all claims

for income or other taxes." See 3 Corbin, Contracts, § 540 for the distinction between reformation and interpretation. However, because the parties regarded the suit as one for reformation we shall treat it as such. In either light the pivotal question is one of fact, i.e., whether in the negotiations for the sale of the partnership assets the sellers' contingent tax liability referred to above was or was not included in the purchase price.

The bargain finally arrived at was the result of negotiations which were carried on between the sellers and defendant during the period from December 20, 1954 until the contract was signed on February 17, 1955. There is testimony to the effect that on various occasions before the contract was formally executed the parties had discussed the question of the tax liability incident to the sale of pelts. The testimony is conflicting as to what was said with respect to tax liability and as to the occasions on which the subject was discussed. Defendant contends that the negotiations in arriving at the purchase price took the following form. He stated that he first offered $30,000 for each partnership interest. According to Riggle, at the time of this offer, there was some conversation relating to the individual tax liability of the partners upon a sale of the partnership, resulting from gains that had been made in the production of 1954 breeder stock. Some time later plaintiff and defendant met at Lewelling's office and later that same day defendant told plaintiff he would pay him $30,000 and assume the obligation for the taxes mentioned above. Riggle testified that soon after this offer was made Mr. Evans estimated that the tax would not exceed $3,000 for each partner and Evans suggested that the sale price be increased to $33,000 to cover the possible tax li-

ability. Riggle considered this a satisfactory solution. Finally, at a meeting held at the home of Mrs. Ellis attended by plaintiff, his brother, Mrs. Ellis, Mr. Evans and defendant, the value of each partner's interest was put at $35,000 and defendant agreed to this figure. However, he asserts that at this final meeting there was no discussion of his assumption of any tax liability.

The plaintiff contends that in the negotiation for the sale of the ranch the tax liability which was of concern to the partners was that which would result from a straight income tax rather than a long term capital gain tax resulting from the sale of mink pelts during the years 1952, 1953 and 1954, which has been explained above.

The testimony is in conflict as to what the parties had discussed at the various stages of negotiation and as to their understanding of those discussions in terms of their respective tax liabilities and defendant's assumption of that liability. Plaintiff relies principally upon two witnesses, Mr. Asa Lewelling, who made the rough draft of the contract in question and Mr. Evans, the administrator of the Ellis estate. Neither of these witnesses had a direct financial interest dependent upon the outcome of the litigation. As will appear presently, their testimony supports plaintiff's version of the case. Defendant attacks their testimony on the ground that they were confused as to what happened at crucial periods in the negotiations.

Mr. Lewelling testified that when he first discussed the question of tax liability with Mr. Riggle, which was early in the negotiations, Mr. Riggle explained the manner of reporting for tax purposes the sale of the pelts from the breeding stock. He explained that the sales were reported as capital gains

as distinct from straight income. Evans asked Riggle if the treatment of the sale in this manner could be made to "stand up" before the taxing authorities. Lewelling testified that Riggle answered "Stacey has the same problem. They've got Stacey up in Portland in court but there's not going to be anything to it." He went on to say that the defense of the tax case was being supported by a mink breeder's association in Wisconsin and that the case would be won. Lewelling testified that it was his recollection that "every time this contract was discussed the matter of * * * the capital gain treatment for the pelts of the breeding mink was discussed." At one of the meetings held in Lewelling's office Evans, referring to the possible tax liability which might arise out of reporting the sales on a capital gain basis, asked Mr. Riggle, "Well what are you going to do about it if we get a kickback on it or some sort of repercussion," to which Mr. Riggle replied, "Well, don't worry about it, we'll take care of it" or words to that effect. Lewelling testified that in drafting the exculpatory clause in the contract it was his purpose to refer to the tax liability arising from the reporting of the income from the breeder pelts as capital gains. Evans also testified that the capital gains aspect of the transaction was discussed with Riggle on several occasions prior to the consummation of the sale. He was not certain as to whether the matter was discussed at the final meeting held at Mrs. Ellis' home.

Defendant contends that both of these witnesses were confused as to the time when the alleged conversations relating to capital gains reporting and liability were held. It is his position that the conversations which related to Stacey's tax liability were held *after* the contract was made and that Lewelling

and Evans were confused when they testified that the conversation took place before the consummation of the contract. We shall not recite the various details of proof by which defendant attempts to establish the confusion of these two witnesses. Their testimony that the negotiations embraced the question of tax liability involved in this case did not rest entirely upon a reference to Stacey's liability. They testified firmly and clearly that the tax question was in the minds of the parties before the contract was made. Lewelling testified without equivocation or qualification that he, the draftsman, inserted the clause in dispute for the very purpose of saving the sellers harmless from the liability referred to by the parties in their negotiations. We do not think that the alleged confusion as to other events overcomes this emphatic statement of what the parties understood. If courts cannot rely upon testimony of this kind then some other method of resolving legal conflicts should be devised.

■ We hold that the exculpatory clause in question must be interpreted in the manner expressed in the lower court's decree of reformation.

■ Defendant contends that even though the contract is reformed by the court, he should not be liable for the payment of the tax to plaintiff because plaintiff voluntarily paid the tax without protest and thus increased plaintiff's risk as indemnitor. This argument is based upon the assumption that plaintiff's voluntary payment of the tax precluded plaintiff or defendant from an action against the government for refund of the taxes paid.

The assessment and payment of the tax was made pursuant to an agreement with the government contained in Form 870 which is entitled "Waiver of Re-

strictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment." The question is whether a payment of a tax under such an agreement precludes a refund.

Form 870 contains a footnote which reads in part as follows:

"Note.—The execution and filing of this form at the address shown in the accompanying letter will expedite the adjustment of your tax liability as indicated above. It is not, however, a final closing agreement under section 7121 of the Internal Revenue Code of 1954, and does not, therefore, preclude the assertion of a deficiency or a further deficiency in the manner provided by law should it subsequently be determined that additional tax is due, nor does it extend the statutory period of limitation for refund, assessment, or collection of the tax."

The inference is clear from this language that the right of refund is contemplated. This is the interpretation placed upon the language by the federal courts. In *Clark v. United States,* 211 F2d 100 (1954), *cert. denied,* 348 US 911, 75 SC 289, 99 LE 714 (1955), the court referring to Form 870, said:

"* * * The signing of such a waiver by a taxpayer is without any effect to preclude him from maintaining a civil suit for refund of the taxes assessed by the Commissioner on the basis of it. Payson v. Commissioner, 2 Cir., 166 F2d 1008, 1009; Herber v. Jones, D.C.W.D. Okl., 103 F Supp 210, 214, affirmed, 10 Cir., 198 F2d 544."

See also, *Hargis v. Godwin,* 221 F2d 486 (1955); *Girard v. Gill,* 261 F2d 695 (1958) and cases cited at page 698 therein.

The tax was paid by plaintiff only after notifying defendant of the proposed assessment and warning

him that if he had any objections to the assessment he should make them known on or before April 5, 1956. The notice was sent on March 29, 1956. In response to this notice defendant refused to pay the tax, denying liability with respect to it. We think that under these circumstances plaintiff was justified in paying the tax.

The decree of the lower court is affirmed.